IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF
VIRGINIA

NORFOLK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 2:19cr47 |
| v. | ) | |
| | ) | 18 U.S.C. § 371 |
| THOMAS L. BARNETT, | ) | Conspiracy to |
| | ) | Commit Wire Fraud |
| Defendant. | ) | |

<u>CRIMINAL INFORMATION</u>

THE UNITED STATES ATTORNEY CHARGES THAT:

INTRODUCTORY ALLEGATIONS

At all times relevant to the criminal information:

1. Defendant THOMAS L. BARNETT ("BARNETT") was an insurance salesman located in California. BARNETT owned and controlled The Financial Light, Inc. a financial advisory services company. BARNETT was never registered as a registered representative, securities agent or broker, or investment advisor.

2. Kent Maerki ("Maerki") was a resident of Scottsdale, Arizona. Maerki was the founder of Dental Support Plus, LLC, and the President and Marketing Director of Dental Support Plus Franchise, LLC, and Dental Support Group, LLC. Maerki also was the founder and former owner of Janus Spectrum, LLC.

3. David Alcorn ("Alcorn") was a resident of Scottsdale, Arizona. Alcorn was the president of David Alcorn Professional Corporation, which became the sole owner of Janus Spectrum, LLC, in January 2014.

4. Daryl G. Bank ("Bank") created, owned, and operated Dominion Investment Group, LLC ("DIG"). DIG was a Virginia limited liability company with offices operating from 4301 Commuter Drive, Virginia Beach, Virginia, 1391 NW St. Lucie West Boulevard, Port St. Lucie, Florida, and 1100 SW St. Lucie West Boulevard, Port St. Lucie, Florida.

5. BayPort Credit Union was a federally-insured credit union that operated in the Eastern District of Virginia.

6. Wells Fargo Bank was a federally-insured bank that operated across the country.

## CONSPIRACY

7. From in or about January 2011 through in or about August 2017, in the Eastern District of Virginia and elsewhere, defendant BARNETT and conspirators Tony Scott Sellers, Kent Maerki, David Alcorn, Aghee William Smith, Norma Jean Coffin, Daryl G. Bank, Raeann Gibson, and others both known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit an offense against the United States, to wit, Wire Fraud, in that BARNETT, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of execution of such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## THE PURPOSE OF THE CONSPIRACY

8. The purpose of the conspiracy was for the conspirators to personally profit by misleading investors in material ways to get them to make investments in Dental Support Plus Franchise ("DSPF") and spectrum investments.

## THE WAYS, MANNER, AND MEANS OF CONSPIRACY

The ways, manner, and means by which BARNETT and the conspirators sought to accomplish this conspiracy included, but were not limited to, the following:

9. Maerki and Coffin created DSPF and Dental Support Group, LLC. Maerki and Alcorn also created Janus Spectrum, LLC.

10. Maerki, Alcorn, Bank, and others, recruited salespeople – primarily insurance salespeople who were unlicensed to sell securities (like BARNETT) – to sell DSPF "franchise units" and spectrum license application services.

11. BARNETT and others sold DSPF "franchise units" and shares in DSPF Group, LLC – a related entity created by Daryl Bank that sold shares in a pool of DSPF franchises – to investors using materially false, fraudulent and misleading representations.

12. BARNETT, and others, financially benefited from the sales of the DSPF and spectrum investments.

13. In furtherance of the conspiracy, BARNETT and the conspirators caused funds involved in the DSPF and spectrum investments to move via interstate wire into and out of the Eastern District of Virginia.

14. In furtherance of the conspiracy, BARNETT and the conspirators caused materially false, fraudulent, and misleading information to be sent via email and via interstate wire to investors in the Eastern District of Virginia, namely thru Bayport Credit Union.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of this scheme, the conspirators engaged in the following overt acts:

15. On or about November 26, 2010, Maerki, Coffin and others, organized DSPF as a member-managed limited liability company in Arizona. Maerki, and others, claimed that DSPF was a franchisor of a dental marketing program franchise that was offered and sold to investors.

3

Maerki, and others, claimed the franchise entity would refer patients to dentists, and that the dentists would return a portion of the fees they earned from these patients to the franchise entity. Such payments allegedly would constitute the return on the investment of the franchise purchasers.

16. On or about March 3, 2011, BARNETT entered into a written agreement to sell DSPF to his clients.

17. From April 2011 through March 2013, BARNETT convinced over 20 victims to invest $1,240,000 of retirement funds to purchase 54 separate "franchise units." Under the insurance laws of California, BARNETT was not permitted to sell this kind of investment product to his clients. Nevertheless, BARNETT pitched DSPF to his clients using advertisements that were materially false and misleading.

18. From January 2013 through January 2014, BARNETT also sold a fraudulent DSPF Group, LLC investment to approximately 13 victims, who invested a total of approximately $273,000.

19. In particular, BARNETT was aware that Bank and Maerki were using DSPF Group, LLC to sell failed "franchise units" to new investors so as to repay earlier investors. In September 2013, BARNETT convinced victim RF to invest $50,000 in DSPF Group, LLC. RF worked in a distribution center of a grocery store and had contacted BARNETT because he was hoping to supplement his retirement savings after his grocery store had cut his overtime hours. BARNETT falsely represented to RF that he could earn $600 per month in connection with this DSPF investment. Based on these material misrepresentations, on September 24, 2013, RF invested $50,000 in DSPF Group, LLC. That same day, Gibson cut a commission check totaling $10,000 to BARNETT's company for this sale. The memo line for the check stated: "$50k of DSPF Group – RF."

20. After receiving RF's investment funds, Bank then used these funds to repay co-conspirator Sellers for two of his failed franchise units. On or about October 18, 2013, BARNETT was copied on an email discussing this transaction. In the email, Maerki questioned why Sellers needed to remain anonymous when he sold his old franchise units to new investor RF. In the email, Bank stated:

> [Sellers'] desire to remain anonymous were several:
> 1. His privacy
> 2. Not broadcasting to his clients he is selling
> 3. Not broadcasting to the salesforce that a "top salesman" was liquidating
> 4. To avoid all the rumor and conjecture that accompanies the aforementioned
> 5. I also shared and agreed with Tony on all of these concerns.

BARNETT never disclosed any of this information to his client RF or to any other client. BARNETT also did not stop selling DSPF Group, LLC to investors, including investor LZ.

21. Around the same time BARNETT was selling DSPF and DSPF Group, LLC to his investors, he also was selling fraudulent spectrum investments through entities associated with Maerki, Alcorn, and Bank. Like the DSPF investments, under the insurance laws of California, BARNETT was not permitted to sell this kind of investment product to his clients.

22. On or about October 16, 2014, BARNETT entered into a written agreement with Bank to serve as an "Independent Trust Consultant" to sell Bank's investment products.

23. In August 2014, DSPF officially shut down. DSPF Group investors lost approximately $895,000. BARNETT's personal clients – including RF and LZ – lost all of the approximately $1,513,000 that he had convinced them to invest in DSPF and DSPF Group.

24. Starting in or about at least January 2012 through August 2015, BARNETT, Maerki, Alcorn, Bank, Smith, and others known and unknown, sold, and caused to be sold, fraudulent spectrum investments to investors by making material misrepresentations, and then conspirators continued to lull investors regarding the purported value of such investments.

25. For example, BARNETT told materially false information to client LZ to convince her to invest funds in, among other things, the DSPF Group, LLC and Spectrum 100, LLC investments. LZ told BARNETT that she had received $200,000 from the settlement of the estate of her parents, who had died in a tragic accident. LZ contacted BARNETT to obtain advice on how to safely invest these settlement funds.

26. On August 1, 2011, BARNETT initially contacted LZ via email and asked if she had "looked at the Dental Support Plus information." BARNETT told LZ "I really think this is the best investment that's out there right now. What other investment has produced 40% to 60% returns each year over the last 5 years?" BARNETT knew full well that LZ would not obtain 40-60% returns on this investment. He concluded by stating: "It really is a wonderful opportunity for you to make the kind of money you desire and free up your time." LZ did not invest in DSPF at that time.

27. In or about December 2013, BARNETT told materially false information to LZ to convince her to invest funds into Bank's DSPF Group LLC. By this time, DSPF Group, LLC was soliciting new investors to purchase failed franchises from earlier investors. BARNETT falsely represented to LZ that her investment in DSPF Group, LLC would provide dental care to low-income families and would generate a guaranteed "stream of income". Having sold DSPF investments since April 2011, BARNETT was well aware that DSPF was not providing the promised returns and that DSPF Group, LLC did not provide dental care to low-income families. Based on this, and other material misrepresentations, LZ invested $50,000 in DSPF Group, LLC. LZ's investment in DSPF Group, LLC resulted in interstate wires into and out of the Eastern District of Virginia. Bank immediately misappropriated over 30% of LZ's investments funds and used the funds, in part, to pay BARNETT's commission.

28. In or about December 2013, BARNETT also made numerous material misrepresentations to LZ about the spectrum investment. BARNETT claimed that Spectrum 100, LLC, was a company that was going to sell broadband licenses to expand the availability of Internet access to remote areas of the country. Upon BARNETT's recommendation, LZ also invested $50,000 into Spectrum 100. This investment resulted in interstate wires into and out of the Eastern District of Virginia. Bank immediately misappropriated approximately 60% of LZ's investment funds and used the funds, in part, to pay BARNETT's commission.

29. On or about December 6, 2013, in reliance on BARNETT's advice, LZ cut a check to Summit Trust company for $150,200. This check and other investment materials were sent via FedEx to Bank and Gibson in Florida.

30. On or about December 13, 2013, BARNETT contacted Gibson about obtaining his commission on LZ's investments. Gibson informed him: "I just received the FedEx package for [LZ]. I will turn this around and get it overnighted to Summit tonight…As soon as the check clears, we can submit your payment to you." On December 20, 2013, BARNETT contacted Gibson again about his commission. In response Gibson stated: "I do have our accountant working now to see if we can call back the direct deposit and send you a wire. That is the only way to get the funds to you today."

31. On or about December 23, 2013, Gibson transferred BARNETT's $18,000 commission generated from LZ's investments to BARNETT's Wells Fargo account ending in 2424.

32. From in or about December 2013 through in or about February 2014, BARNETT convinced four separate investors to invest a total of $185,000 into Bank's fraudulent Spectrum 100 investment. LZ and the other investors lost the entirety of their investment funds. Meanwhile,

7

Bank stole between 40-60% of these funds for himself, out of which he paid BARNETT thousands of dollars for "commissions" on these sales.

33. As a result of his conduct in this conspiracy, BARNETT received fraud proceeds totaling at least $210,640.

(All in violation of Title 18, United States Code, Section 371.)

FORFEITURE

1. Defendant THOMAS L. BARNETT, upon conviction of Count One of the criminal information, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

2. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

(All in accordance with Title 18, United States Code, Section 982(a)(l); Title 18, United States Code, Section 981 (a)(l)(C), as incorporated by Title 28, United States Code, Section 2461(c); and Title 21, United States Code, Section 853(p).)

                   Jessica D. Aber
                   United States Attorney

By: _____
     Elizabeth M. Yusi
     Melissa E. O'Boyle
     Andrew C. Bosse
     Assistant United States Attorneys